UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

CHARLES K. SMITH    :
           :
   Plaintiff,    :
           :
v.          :   No. 2:08-cv-177
           :   *Mattice / Lee*
CARITEN INSURANCE COMPANY :
           :
   Defendants.   :

## REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiff Charles K. Smith brought this action against Defendant Cariten Insurance Company ("Defendant" or "Cariten") pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B) ("ERISA") [Doc. 1-2, 10, 20]. Plaintiff asserts certain health benefits were wrongfully denied and certain health insurance benefits were not paid by Cariten [Doc. 10 at 1]. Before the Court are Cariten's motions to dismiss this action or, in the alternative, for judgment on the ERISA administrative record [Doc. 4 & 25]. This matter has been referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and © [Doc. 26].

For the reasons stated herein, I **RECOMMEND** that: (1) the aspect of Cariten's original motion to dismiss which seeks dismissal of Plaintiff's state law claims on the grounds they are completely preempted by ERISA be **GRANTED** and (2) the aspect of Cariten's motions which seeks

-1-

dismissal of Plaintiff's ERISA claims and a judgment on the ERISA administrative record be **GRANTED**.

## II.     Background

Plaintiff filed his original complaint on April 4, 2008, in the law court for Washington County asserting state law claims for fraud and a violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.* ("TCPA") [Doc. 1-2 at 5-7].   On May 2, 2008, Cariten filed its original motion to dismiss asserting this action should be dismissed on the ground Plaintiff's state law claims against Cariten are completely preempted by ERISA, and, based upon the administrative record, Cariten paid all claims in accordance with the policy and Plaintiff cannot show Cariten acted arbitrarily and capriciously [Doc. 4].   Thereafter, Plaintiff moved to amend his complaint to add claims under ERISA [Doc. 10].   Plaintiff's motion to amend was granted on June 24, 2008 [Doc. 20].   Subsequently, Cariten filed a motion to dismiss Plaintiff's amended complaint adopting and incorporating the arguments and material supporting its original motion to dismiss [Doc. 25].

### A.     The Allegations

In his complaint, Plaintiff asserts the following:   He began experiencing cardiac health problems in the summer of 2005 and, because of the complexity of his condition, his treating doctor, a cardiologist in Johnson City, Tennessee, referred Plaintiff for treatment to the Cleveland Clinic in Cleveland, Ohio [Doc. 1-2 at 3, ¶ 3].   Plaintiff decided to follow the advice of his treating physician and it was determined he would be treated with a cardiac ablation procedure at the Cleveland Clinic [*id.* at ¶ 4].   Prior to the performance of the cardiac ablation procedure Plaintiff "precertified" the procedure with Cariten, which determined that under Plaintiff's preferred provider organization

("PPO") plan (the "Plan"), the procedure, if performed at the Cleveland Clinic, would be treated as an "out of network" procedure [*id.*]. Plaintiff asserts that under the Plan, even an out-of-network procedure has a maximum "out of pocket annual expense" of $4,000.00 and that he spoke with a representative of Defendant prior to leaving for the cardiac ablation procedure, and was assured the maximum payment he would have to make for his surgical treatment was $4,000.00 [*id.*]. Plaintiff traveled to the Cleveland Clinic, which had assisted him with the pre-certification process, and a representative of the Cleveland Clinic also told him that "per his health insurance carrier," his maximum out-of-pocket expense for the coronary ablation procedure would be $4,000.00 [*id.*].

Plaintiff underwent the coronary ablation procedure on October 11, 2005, and was discharged on October 12, 2005, to a hotel room which adjoined the heart surgery center at the Cleveland Clinic [*id.* at 4, ¶ 5]. Plaintiff asserts that on October 13, 2005, he developed complications following his cardiac ablation, which resulted in his being kept in the emergency room ("ER") at the Cleveland Clinic and then being admitted to the hospital [*id.*]. Plaintiff was discharged after three days [*id.*].

As the result of his cardiac ablation procedure and subsequent emergency treatment and hospitalization, Plaintiff has incurred physician, hospital, and medical bills in excess of $50,000, of which Cariten paid approximately $1,200.00 [*id.* at 4-5, ¶ 6]. In his original complaint Plaintiff alleged the actions of Cariten – in assuring him of his out-of-pocket costs prior to the coronary ablation procedure and then paying virtually none of his medical bills – constituted fraud as well as an unfair and deceptive trade practice under the TCPA [*id.* at 5, ¶ 8]. In his amended complaint, Plaintiff asserts Cariten wrongfully denied him contractual health benefits and refused to pay contractual health insurance benefits which were due him under the Plan in violation of ERISA

-3-

[Doc. 10 at 1-2, ¶¶ 2, 3]. Plaintiff asserts the language of the Plan is ambiguous because the Plan documents fail to define the term "balance billing." [*id.* at 2, ¶ 4]. Plaintiff asserts that because of the ambiguity in the Plan documents, he relied on the misrepresentations of Cariten's representative during the pre-certification process that his maximum out-of-pocket expense, even at an out-of-network facility, would be at the maximum amount of $4,000 [*id.*].

Plaintiff also asserts the doctrine of equitable estoppel applies to his ERISA claims and that Cariten and its agents made statements of material facts, when they knew or should have known the true facts, and also knew or should have known Plaintiff would rely on those statements and assurances [*id.* at ¶ 5]. Plaintiff asserts he did not know the true facts and reasonably and detrimentally relied on the statements made by Cariten and its agents. Plaintiff also asserts that Cariten's decision to treat his hospitalization at the Cleveland Clinic as out-of-network was arbitrary [*id.* at ¶ 6].

### B.    Record

The Certificate of Insurance indicates the policyholder of Plaintiff's Plan is his employer, Transit Mix Concrete Co., who is the "Group" or the "Plan Sponsor" and that the applicable policy, *i.e.*, the Plan, is 101502-PP (Sapphire 1000) (A.R. 9, 24).[1] The Schedule of Insurance for the Plan, states, in pertinent part, that:

> The benefits for which a Member is insured under this Plan will be determined in accordance with this Certificate of Insurance, including the schedule provided with this Certificate of Insurance (the Summary of Benefits") and the following summary.

---

[1] Cariten has "Bates stamped" the pages of the administrative record from 001 to 224. Throughout this report and recommendation the pages of the administrative record will be cited to as "(A.R. __)."

-4-

When a Participating Provider provides a confinement, supply, service, test, procedure, examination, treatment, or any other medical or health care item or service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, benefits will be determined in accordance with the column on the Summary of Benefits entitled "In-Network". When a Nonparticipating Provider provides a confinement, supply, test, procedure, examination, treatment, or any other medical or health care item or service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, benefits will be determined in accordance with the column on the Summary of Benefits entitled "Out-of-Network."

(A.R. 25).

The Summary Plan Description sets forth the following relevant General Definitions:

**MAXIMUM ALLOWABLE CHARGE:** Means the fee schedule charge for a Covered Expense or Covered Prescription Drug Expense, if applicable, set forth in Cariten's then currently approved fee schedules for Participating and Nonparticipating Providers.
. . .
**OUT-OF-POCKET MAXIMUM:** Means the maximum amount of percentage Copayments and Excess Charges payable by a Member or Insured Members of a Family in any Calendar Year; provided that Deductibles, fixed Copayments and Expenses Incurred resulting from failure to obtain Precertification, prescription drugs and Excluded Services do not apply toward the Out-of-Pocket Maximum.

(A.R. 68-69).

If a Member obtains from a Nonparticipating Provider a confinement, supply, service, test, procedure, examination, treatment, or any other medical or health care item or service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, the Member may be responsible for the difference between the Nonparticipating Provider's charges and the Maximum Allowable Charge if the Nonparticipating Provider's charges are more than the Maximum Allowable Charge for such item or service.

-5-

(A.R. 25).

On October 10, 2005, Cariten sent a letter to Plaintiff regarding his treatment at the Cleveland Clinic, which states in pertinent part that:

> On October 10, 2005, Cariten Healthcare received an authorization from Dr. Saliba for coverage of out-of-network pulmonary vein isolation at Cleveland Clinic, at in network benefit. The information submitted has been reviewed as well as the benefits covered by your health plan.
>
> After careful consideration of all the available information and your benefits, our Physician Advisor regrets to inform you that the above requested service cannot be approved at this time.
>
> We denied this request because medically necessary and appropriate services are available from in-network providers. Specifically, pulmonary vein isolation can be provided by in-network specialists. There is insufficient information provided to establish that treatment by an in network specialist for pulmonary vein isolation is not appropriate. Your PPO Plan allows you to utilize out-of-network services at a lower benefit level.
>
> Utilizing out-of-network/non-participating providers for services may lead to increased out-of-pocket expenses and financial responsibility. . . .

(A.R. 87).

A letter from Cariten to Plaintiff, which is dated July 20, 2006, states in pertinent part:

> On May 23, 2006, Cariten Healthcare received an appeal request for in-network benefits to the Cleveland Clinic. The information submitted has been reviewed as well as the benefits covered by your health plan.
>
> After careful consideration of all the available information our Physician Advisor who is board certified in emergency medicine has determined that the original decision must be upheld.
>
> We denied this request because:

Your PPO plan does not authorize out-of-network referrals at in-network benefits when there are in-network providers available. It was determined that there is in-network availability for the services you seek.

We utilized the following resource to make this decision: Cariten PPO Plan Document Schedule of Benefits.

All clinical treatment decisions are the sole responsibility of the practitioner and the member, not withstanding any medical necessity decision recommendations by Cariten Healthcare. . . .

If you are not satisfied with the decision reached by Cariten Healthcare you may have Cariten's response reviewed by the State Insurance Commissioner by mailing a request to:

State of Tennessee Department of Commerce and Insurance
Attn: Grievance Coordinator
Davy Crockett Tower 4th Floor
500 James Robertson Parkway
Nashville, TN 37243-0582
Phone (800) 861-1270

You have the right to have an independent review of certain final decisions made by Cariten. If you request it, an appeal review will be conducted by an Independent Review Organization (IRO). An IRO is not connected in any way with Cariten. Cariten must go along with the IRO's decision and carry out its instructions.

(A.R. 106-07).

On October 16, 2006, Plaintiff filed a grievance with the Tennessee Department of Commerce and Insurance ("TDCI"), which states in pertinent part:

I am writing concerning the refusal of Cariten Healthcare to pay my medical bills. They refuse to pay, but do not tell me why. They just tell me that their Physician Advisor has reviewed my situation and determined that they are not libel [sic] for the expenses. This is in contrast to what I was told by a member of the Claims Supervisor Staff at Caratin [sic]. Before I went to Cleveland I called Cariten and was told that "$4,000.00 would be

-7-

the most I would have to pay and all else would be paid by Caritene [sic] or deducted by The Cleveland Clinic". Apparently the Cleveland Clinic was told the same thing because they called me and requested that the $4,000.00 be paid before the surgery. They agreed to come to the hotel and pick up the check upon my arrival the day before the scheduled surgery. I was to call them upon arrival and I did just that but was told at that time it would not be necessary for them to come get the money.

My situation was this: I had been suffering with bouts of Atrial Fribulation [sic] for four or five years and had been on several drugs for that condition. I finally got to the place where my cardiologist recommended that I have the Pulmonary Vein Isolation/Ablation procedure done, and that it be done at the Cleveland Clinic in Cleveland, Ohio, due to the complexity of my situation. Cariten countered that there were two doctors in Knoxville who could do this procedure. My Cardiologist objected, saying "he had sent patients there and had not had good results and would not send me there due to the complexity of my situation." So I listened to my doctor instead of someone sitting at a desk in Knoxville who knew nothing about my condition. I went to Cleveland and had the procedure done on October 11, 2005. I have no reoccurrence of Atrial Fribulation [sic] . . .

(A.R. 157).

On January 3, 2007, Ronnie Manning ("Manning"), an Insurance Investigator with the TDCI wrote to Cariten, enclosed a copy of Plaintiff's complaint, and requested a detailed response which fully addressed each concern raised by the Plaintiff (A.R. 155). On January 26, 2007, Lori Bell ("Bell"), Grievance Coordinator in Cariten's Appeals Department, responded to Manning's letter, stating:

I am responding to the complaint filed regarding Cariten's denial of in-network benefits for out-of-network services rendered for [Plaintiff]. The complaint was against the charges and the claims for the dates of service 10/11/05, 10/13/05 and 1/18/06. The charges in question were processed at the member's out-of-network benefit as services were available in-network. The

information submitted has been reviewed as well as the benefits covered by the insured's health plan.

After careful consideration of all the benefits of the member's plan, Cariten Healthcare has determined that the original decision must be upheld. The principal reason for this determination is second opinions, diagnostic testing, surgery and other services supplied by the facility are available in-network. This member has a valuable PPO insurance plan, which pays maximum benefits, when the member uses a network provider or network facility. The plan also allows the member to go out-of-network electively without a referral for care at a reduced benefit level. At no time does Cariten Healthcare suggest or advise a plan of care for a member. The plan or care is the responsibility between the member and the member's physician. However, the decisions made at Cariten are based upon review of contracted benefits and at no time would we be allowed to override and violate those contracts. Since service is available in-network, the member would need to stay in-network to achieve maximum benefits of his healthcare plan.

. . .

The member's correspondence referenced $4,000 as the maximum the member would have to pay. However, per a phone call from the member to Member Services on 1/12/06, the member was advised that his out-of-network out-of-pocket maximum is $4,000. This in no way indicates the maximum total out-of-pocket expense including out-of-network deductibles and provider billing, this in only a quotation of his member responsibility per his PPO plan. The out-of-pocket expense of $4,000 is the coinsurance for the plan benefit. This does not include the $2,000 out-of-network deductible per the enclosed Summary of Benefits. The member is responsible for any additional charges not covered by Cariten's allowed amount for each service rendered.

(A.R. 152-53). A copy of the summary of benefits under the Cariten Plan was attached to Bell's letter (A.R. 154).

On March 7, 2007, Manning responded to Bell's letter and requested additional information, stating:

-9-

I do, however, need to request additional information. Please provide policy provisions to show how benefits were calculated for the 10/13/05 ER visit, and hospitalization and other charges related to this. The EOB – explanation of benefits – shows that only $1,600 was allowed for this $7945.07 bill and $800 was the amount that was paid. The policy provisions should show when in-network and out-of-network benefits should be applied to ER visits, related charges and subsequent hospitalization. Also, please provide a copy of the in-network fee schedule to show how the amount paid was arrived at. . . .

. . .

In addition to the above, please explain in detail how the benefits were calculated for the 10/11/05 hospitalization. The Summary of Benefits shows 50% of usual and customary after deductible. The charge was for $39,998.86. The insurance only covered $400.

(A.R. 120, 123).

On March 19, 2007, Bell responded to Manning's letter stating, in pertinent part:

Following review, benefit determination for the ER visit for date of service 10/13/05 for $7945.08. The amount paid was based on the out-of-network authorization for two inpatient days paid at Cariten's out-of-network inpatient perdiem of $800. The member's out-of-network benefits is 50% after deductible, leaving the member paying $800 for the toal [sic] allowed amount of $1600. The member entered the hospital through the ER, but the facility admitted the patient; therefore, the charges are processed as an inpatient claim. No ER payment logic applies.

Benefit determination for the date of service 10/11/05 for billed charge of $39,998.86 was based on the out-of-network authorization. The claim payment has been reversed to pay at a higher level, but is still based on Cariten's out-of network fee schedule of $930 perdiem for surgical bed rate. Only one inpatient surgical bed was authorized at out-of-network rated for this date of services. The member's out-of-network benefit for inpatient services is 50% after deductible, leaving the member paying $465 for the total allowed amount of $930. The member has a valuable PPO plan and may choose to obtain services out-of-network at a reduced benefit. The services rendered were available in-network, for this reason, the payment must remain at the out-of-network

-10-

> benefit level.  I have enclosed Cariten's out-of-network fee
> schedule for your review.

(A.R. 116).

Cariten's out-of-network fee schedule is attached to Bell's letter and states, in pertinent part:

> **INPATIENT SERVICES** - Inpatient services will be reimbursed
> at the lesser of billed charges or the following rates:

| | | |
|---|---|---|
| Medical/Surgical | $800 - | $900 per diem |
| ICU | $1225 - | $1375 per diem |
| CCU | $1275 - | $1525 per diem |

(A.R. 118).

The Summary of Benefits provided by Cariten for the Sapphire 1000 Policy, Plaintiff's

Plan, states, in pertinent part:

| | In-Network | Out-of-Network |
|---|---|---|
| **Physician Services** | | |
| Inpatient Visits/Surgery | 70% after deductible | 50% after deductible |
| . . . | | |
| **Hospital Services** | | |
| Inpatient Confinement/Transplants | 70% after deductible | 50% after deductible |
| Outpatient Services/Surgery | 70% after deductible | 50% after deductible |
| . . . | | |
| **Other Care** | | |
| Lab & X-ray [2] | 70% after deductible | 50% after deductible |
| Out-of-Pocket Maximum (individual/family) | $2,000/$4,000 | $4,000/$8,000 |

---

[2]  This applies to lab and x-ray services provided outside a physician's offices.  Other rates of reimbursement apply to lab and x-ray services provided in a physician's office.

-11-

(A.R. 8). The Summary of Benefits also notes that for out-of-network services, the "Member may be subject to balance billing from Nonparticipating Providers for any out-of-network benefits." (*Id.*).

## III.     Analysis

### A.     State Law Claims

As noted, in its original motion to dismiss Cariten seeks dismissal of Plaintiff's state law claims of fraud and an unfair and deceptive trade practice under the TCPA pursuant to Fed. R. Civ. P. 12(b)(6) on the ground of complete preempted under ERISA [Doc. 4].

Rule 12(b)(6) provides for the dismissal of a complaint that fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is to permit a defendant to test whether, as a matter of law, the plaintiff is entitled to relief even if everything alleged in the complaint is true. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Assoc. of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (citing *Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 1974 (2007)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* A court must determine not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In making this determination, the court must construe the complaint in the light most favorable to plaintiff and accept as true all well-pleaded factual allegations. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). Mere legal conclusions or unwarranted factual inferences need not be accepted as true. *Id.*

-12-

"ERISA preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'" *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 452 (6th Cir. 2003) (quoting ERISA § 514(a), 29 U.S.C. § 1144(a)). In the ERISA context, "the term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law." *Id.* (quoting ERISA § 514(c)(1)). "To relate to a benefit plan, a law only need have 'a connection with or reference to such a plan.'" *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983)). Consistent "with the Supreme Court's recognition of the broad scope of ERISA preemption, the Sixth Circuit 'has repeatedly recognized that virtually all state law claims relating to an employee benefit plan are preempted by ERISA.'" *Id.* (quoting *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991)). State law claims are not preempted if their "effect on employee benefit plans is merely tenuous, remote or peripheral." *Id.* In deciding whether state law claims are preempted under ERISA, the Sixth Circuit has "focused on the remedy sought by plaintiffs." *Id.* (citing *Lion's Volunteer Blind Indus., Inc. v. Automated Group Admin., Inc.*, 195 F.3d 803, 806 (6th Cir. 1999)). "ERISA preemption is 'deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern.'" *Levy v. Chandler*, 287 F. Supp. 2d 831, 835 (E.D. Tenn. 2003) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987)). "The only exception to the broad scope of ERISA preemption is for state laws regulating 'insurance, banking, or securities.'" *Id.* (quoting 29 U.S.C. § 1144(b)(2)(A)).

Plaintiff's claims for fraud and under the TCPA seek recovery of benefits he alleges are due him from Cariten under the Plan in question. Thus, these state law claims "clearly 'relate to' ERISA plans within the meaning of § 1144(a) and are therefore preempted." *See id.* (citing *McSharry v. Unumprovident Corp.*, 237 F. Supp. 2d 875, 880 (E.D. Tenn. 2002)).

Accordingly, I **RECOMMEND** the aspect of Cariten's original motion to dismiss which seeks dismissal of Plaintiff's state law claims on the ground of complete preemption by ERISA be **GRANTED**.

### B.     ERISA Claims

#### 1.     Standard

In this instance, both Plaintiff and Defendant appear to concede the arbitrary and capricious standard applies to Cariten's decisions under the Plan, Cariten has a conflict of interest, and that conflict of interest should be considered as a factor in determining whether Cariten's decision was arbitrary and capricious. *See Metro Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2351 (2008) ("[W]hen judges review the lawfulness of benefits denials, they will often take account of several different considerations of which a conflict of interest in one.").

Pursuant to the holding of the Sixth Circuit in *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 619 (6th Cir. 1998), a district court "reviews a denial of benefits under an ERISA plan and renders judgment based upon the administrative record." *Williams v. Continental Cas. Co.*, 138 F. Supp. 2d 998, 1001 (M.D. Tenn. 2001) (citing *Gatlin v. Nat'l Healthcare Corp.*, 16 F. App'x 283, 287 (6th Cir. 2001)).   "An employee may challenge a benefit eligibility determination under 29 U.S.C. § 1132(a)(1)(B)." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).  However, it is the employee's "burden to show that he was entitled to the 'benefits . . . under the terms of his plan.'" *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) (citing 29 U.S.C. § 1132(a)(1)(B)).

The arbitrary and capricious standard of review is used "in order to avoid 'excessive judicial interference with plan administration.'" *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)

-14-

(citing *Cook v. Pension Plan for Salaried Employees*, 801 F.2d 865, 870 (6th Cir. 1986) (quoting *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir.), *cert. denied*, 464 U.S. 829 (1983)). When using the arbitrary and capricious standard to review the denial of benefits under an ERISA plan, the court is "required to consider only the facts known to the plan administrator at the time he made his decision." *Yeager*, 88 F.3d at 381 (citing *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)).

"[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). When it applies the arbitrary and capricious standard, a reviewing court "is limited to a determination of whether the [administrator's] actions were done rationally and in good faith, not whether it is right." *Bowen v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, No. 91-3981, 1992 WL 92832, * 3 (6th Cir. 1992). A decision "is not arbitrary or capricious if it is a reasonable interpretation of the plan's terms and was made in good faith." *Torix v. Ball Corp.*, 862 F.2d 1428, 1429 (10th Cir. 1988) (citing *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1152 (9th Cir. 1986)).

Factors considered in determining if an action was arbitrary and capricious include "(1) uniformity of construction" and "(2) fair reading and reasonableness of that reading." *Bowen*, 1992

WL 92832 at * 3 (citing *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir. 1989)).  The standard requires a decision "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence."  *Baker v. United Mine Workers of America, Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Although arbitrary and capricious review has been described as being extremely deferential and the least demanding form of judicial review, "[i]t is not, however, without some teeth." *McDonald*, 347 F.3d at 172 (quoting *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)).  "Deferential review is not no review and deference need not be abject."  *Id.* (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)).

## 2. Arbitrary and Capricious Review

Plaintiff asserts Cariten's decision is arbitrary and capricious and the charges he incurred in the ER at the Cleveland Clinic should have been paid as Emergency Services, not as inpatient services.  Plaintiff also asserts the arbitrary and capricious nature of Cariten's position was demonstrated when it subsequently increased the amount it paid for Plaintiff's October 11, 2005 surgery related claims and paid at the higher level of the "Inpatient Services – Medical/Surgical per diem allowance."  Finally, Plaintiff asserts the arbitrary and capricious nature of Cariten's decision is shown by its decision to ignore the medical opinion of Plaintiff's treating cardiologist, Dr. Harold Alison, who referred Plaintiff to the Cleveland Clinic as the only center with sufficient experience to treat Plaintiff, given the complexity of his condition, and to pay for Plaintiff's treatment at the Cleveland Clinic as out-of-network rather than in-network treatment.  Thus, Plaintiff asserts:

> [b]ased upon [Cariten's] arbitrary and capricious conduct in
> deciding that the required pulmonary vein isolation procedure
> performed at the Cleveland Clinic was equivalent to services

-16-

offered at an in-network facility, in direct contradiction to Plaintiff's treating cardiologist's medical opinion, as well as [Cariten's] inherent conflict of interest in simultaneously making benefit claim decisions and paying those claims approved, Cariten's decision that the Cleveland Clinic medical expenses were incurred by Plaintiff as out-of-network expenses cannot stand. As a result, Plaintiff respectfully requests that this Court award Plaintiff equitable relief, pursuant to a claim for improperly denied benefits under 29 U.S.C. § 1132(a)(1)(B), in the amount of benefits due Plaintiff has these charges been incurred as an in-network facility.

[Doc. 13 at 15].

In a supplemental filing, Plaintiff states "that apparently the Defendant has decided to make certain additional payments requested in this cause of action." [Doc. 29 at 1]. Plaintiff states his:

Counsel has just become aware of additional payments that have been made on the policy in question AFTER the filing of the Motion to Dismiss. This has been confirmed through telephone call to the Cleveland Clinic . . . and which payment was posted on or about May 15, 2008 by the Cleveland Clinic. [Cariten], following more than 2 ½ years from the request for payment, and after filing of this cause, and while this matter is pending, suddenly pays $7,145.08. Would the same not be an admission that the Plaintiff's claim has merit, and the Plaintiff is entitled to at least attorney's fees . . . .

[*Id.* at 1-2].[3]

In its reply to Plaintiff's response, Cariten states that Plaintiff:

argues at length about the processing by . . . Cariten . . . of the claims for his visit to the emergency department at the Cleveland Clinic, but Cariten has now paid these claims in full based on that provider's billed charges. Any confusion on this point was caused by [Plaintiff] filing his Complaint without having first exhausted his administrative remedies. Finally, Smith tries to assert a claim

---

[3] Although Plaintiff mentions attorney's fees in the supplemental response [Doc. 29], no motion for attorney's fees is pending before the Court. Therefore, the issue of attorney's fees is not addressed herein.

-17-

for equitable estoppel, but that claim is barred by the plain and unambiguous Policy language and because Smith could not possibly have actually or reasonably relied upon a communication from Cariten that occurred after his treatment.

[Doc. 14 at 1]. Cariten has responded to Plaintiff's supplement by noting the issue raised in Plaintiff's supplement is not a new issue because the payment at issue is reflected in the ERISA record [Doc. 30 at 1].

### a. In-Network Rates

Plaintiff asserts his treatment at the Cleveland Clinic should have been reimbursed at the Plan's in-network rates, *i.e.*, based on Cariten's in-network fee schedule, rather than at out-of-network rates, *i.e.*, based on Cariten's out-of-network fee schedule. A letter of appeal written by Plaintiff's treating physician, Dr. Alison, on June 30, 2005, states:

> [Plaintiff] has paroxysmal atrial fibrillation with bradycardia, tachycardia syndrome and PVCs. He has a complicated situation for radio-frequency ablation for atrial fibrillation. This needs to be treated as in network but will be seen as out-of-network due to no physician in the network that can perform this procedure, also we have no center in the area that has a good track record for paroxysmal atrial fibrillation. I therefore recommended that he go to the Cleveland Clinic as this is the one we use for other patients with similar Medical Necessity with great results.

(A.R. 159, 163, 222).

Dr. Alison wrote a subsequent letter to Cariten on March 28 2006, which states, in pertinent part:

> [Plaintiff] is a 64-year-old gentleman with paroxysmal atrial fibrillation, premature contractions, and sick sinus syndrome. Because of the complexity of his arrhythmias and inability for most electrophysiologists to do a good job in treating his situation, I sent him to one of the best places in the county being the

-18-

Cleveland Clinic. I thought that they would be able to do a better job than he would be able to receive in any local institution.

(A.R. 160, 221).

The Plan sets forth the following relevant definitions:

> **NONPARTICIPATING PROVIDER**: Means an Organization, Physician, or Hospital that, at the time Covered Expenses or Covered Prescription Drug Expenses are incurred, does not have a signed contract with Cariten.

> **PARTICIPATING PROVIDER**: Means a health care professional, facility, or organization that, at the time Covered Expenses or Covered Prescription Drug Expenses are incurred: (1) has contracted with Cariten to provide service to Members under the Plan; and (2) is named on the current participating provider list available through Cariten.

(A.R. 69).

As noted, the Schedule of Insurance of the Plan, states, in pertinent part, that:

> The benefits for which a Member is insured under this Plan will be determined in accordance with this Certificate of Insurance, including the schedule provided with this Certificate of Insurance . . . and the following summary.

> When a Participating Provider provides a confinement, supply, service, test procedure, examination, treatment, or any other medical or health care item or service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, benefits will be determined in accordance with the column on the Summary of Benefits entitled "In-Network." When a Nonparticipating Provider provides a confinement, supply, service, test, procedure, examination, treatment, or any other medical or health care item or service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, benefits will be determined in accordance with the column on the Summary of Benefits entitled "Out-of-Network".

> If a Member obtains from a Nonparticipating Provider a confinement, supply, service, test, procedure, examination,

treatment, or any other medical or health care item of service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, the Member may be responsible for the difference between the Nonparticipating Provider's charges and the Maximum Allowable Charge if the Nonparticipating Provider's charges are more than the Maximum Allowable Charge for such item or service.

(A.R. 25).

The Summary Plan Description for the Plan states, in pertinent part:

**Provider Network**
Cariten Insurance Company has contracted with a network of Physicians, Hospitals, Free-Standing Surgical Facilities and other healthcare providers to provide health care services under this Plan. A list of Participating Providers in the network will be provided to you automatically, without charge.

(A.R. 56).

Although no list of Participating Providers appears in the record, there is no dispute based upon the pleadings of the parties that the Cleveland Clinic was not a participating provider as defined in the Plan. Plaintiff has not contended that the Cleveland Clinic was a participating provider. Thus, under the Plan's Schedule of Insurance, for services provided to Plaintiff by the Cleveland Clinic as nonparticipating provider "benefits will be determined in accordance with the column on the [Plan's] Summary of Benefits entitled 'Out-of-Network'." (A.R. 25).

Plaintiff has not identified any provision of the Plan which provides authority for Cariten to pay for services provided to Plaintiff by a nonparticipating provider, such as the Cleveland Clinic, under the in-network rates set forth in the Plan's Schedule of Insurance. Plaintiff asserts, however, Cariten should have reimbursed the Cleveland Clinic for the treatment he received on October 11, 2005, at "in-network" rates rather than "out-of-network" rates because he asserts there was no

-20-

in-network (*i.e.*, participating) provider, who could have provided the treatment he received at the Cleveland Clinic.

A contact service form ("CSF"), which was originated on August 2, 2005 and closed on August 11, 2005, states that on July 29, 2005, Cariten received a request via facsimile ("fax") for an out-of-network referral from Dr. Alison, an in-network cardiologist, to Dr. Walid Saliba, a cardiac pacing and electrophysiology specialist at the Cleveland Clinic in Ohio, due to a PPO member with a diagnosis of parosysmal atrial fibrillation with bradycardia, tachy-brady syndrome. (A.R. 77). The CSF also states that the fax from Dr. Alison included the statement that Dr. Alison had "used local & in-network facilities but have found Cleveland Clinic to be mroe [sic] successful."

The CSF further states, in pertinent part:

> On 8/2/05 - review . . . and contact with in-network providers reveals the following physician offices who's [sic] staff stated they could perform this Radiofrequency Ablation for Atrial Fibrillation:
>
> (1)      Dr Jeff Baerman of Knoxville Heart Group . . . new plaintiff. appt available within a few weeks.
>
> (2)      Dr Jeff Hirsh of Knoxville Cardiovascular Group . . .
>
> (3)      Dr Robert Belt or Dr. William Lindsey of East TN Heart Consultants, new pt. appt. available within next 2 weeks.
>
> (4)      Cardiovascular Associates – in Kingsport - Dr. James Merill, Dr. Greg Jones, and Dr. Arun Rao.
>
> On 8/2/2005 – Discussed request and submitted information with . . . (Dr. Deean).  Administrative Non-authorization issued due to in-network availability.

(*Id.*).

The CSF also indicates Cariten contacted Dr. Alison's office and advised the request to approve payment of Plaintiff's treatment at the Cleveland Clinic at Cariten's in-network rates would not be approved, Plaintiff had an option to appeal, Plaintiff had a PPO Plan with out-of-network benefits and could electively choose to pursue the treatment at the Cleveland Clinic as an out-of-network provider, and provided names of the in-network providers identified as being capable of performing the Radiofrequency Ablation for Atrial Fibrillation (A.R. 77-78).

A later CSF dated August 2, 2005, stated that Dr. Alison indicated to Cariten he would not refer his patients to the in-network providers identified by Cariten (A.R. 78). Cariten indicated that additional in-network providers had been identified and this information had been relayed to Dr. Alison's office (*id.*). A CSF on August 3, 2005, also identified additional in-network physicians under Plaintiff's Plan who would perform the Radiofrequency Ablation for Atrial Fibrillation procedure (A.R. 79).

A CSF dated October 10, 2005, states, in relevant part:

> In network cardiologist Dr. Allison referred [Plaintiff] to Dr. Saliba at Cleveland Clinic due to [Plaintiff's] "complicated situation" stating "we have no center in the area that has a good track record for paroxysmal atrial fibrillation" and he adds: "I have used the physicians in Knoxville in the past and I was not pleased with the care. Due to this, I only refer to the Cleveland Clinic."
>
> Verified today, there are two physicians in network that perform Pulmonary Vein Isolation. Dr. Cary Howard Meyers and Dr. Stanley Gall, both with Cardiovascular Associates.

(A.R. 94-95).

Based upon all the circumstances, including the apparent conflict of interest in this matter, I **CONCLUDE** Cariten's decision that out-of-network, rather than in-network, rates applied to

Plaintiff's treatment at the Cleveland Clinic was not arbitrary and capricious. Based upon the correspondence between Dr. Alison and Cariten and the Cariten CSFs, Cariten identified in-network physicians who could perform the procedure. Dr. Alison indicated he had used in-network physicians in the past but felt Plaintiff would most likely obtain better results if he received treatment at the Cleveland Clinic. Plaintiff followed the advice of his treating physician and opted for treatment at the Cleveland Clinic at out-of-network rates and declined treatment by the in-network physicians identified by Cariten, at in-network rates. Plaintiff has pointed to no provision in the Plan or Summary Plan documents which provide Cariten is required to pay for treatment at a nonprovider/out-of-network facility at in-network rates where in-network providers are available to perform the procedure, but a covered member under the Plan opts to follow the recommendation of his treating physician and pursue treatment at an out-of-network facility.

In this situation, Plaintiff was faced with an option to seek treatment from the in-network providers under his Plan – for which Cariten would reimburse the in-network providers at in-network rates – or follow the recommendation of his treating physician and seek treatment at an out-of-network facility, which would result in Plaintiff being responsible for a greater portion of his hospital bill. Plaintiff opted to follow the recommendation of his treating physician and, under all the facts and circumstances of this matter, Cariten's decision to reimburse the Cleveland Clinic at out-of-network instead of in-network rates is not arbitrary and capricious.

### b. ER Payments

Plaintiff asserts that "[i]n a new document, admittedly not part of the administrative record as it was just recently mailed to Plaintiff . . . Cariten has inexplicably increased the allowable benefit collectable by Plaintiff on the ER claim." [Doc. 13 at 11]. Cariten responds that Plaintiff argues at

length about its processing of his claims for his visit to the ER at the Cleveland Clinic, "but Cariten

has now paid these claims in full based on that provider's billed charges. Any confusion on this

point was cause by [Plaintiff] filing his Complaint without having first exhausted his administrative

remedies." [Doc. 14 at 1]. Cariten further explains that Plaintiff

> argues that Cariten improperly processed his claim for the October
> 13-14, 2005, visit to the emergency department of the Cleveland
> Clinic. [Plaintiff] misapprehends what benefits Cariten has paid
> and what is stated by the administrative record . . . [in] his
> Response, Smith says that Cariten has revised its determination of
> that claim to pay $2240.00 on a total claim of $7945.08 and that
> evidence of this payment is "admittedly not part of the
> administrative record." [Plaintiff] is . . . wrong. . . . In fact, (1)
> Cariten paid the full $7945.08 and (2) evidence of that payment is
> contained in the administrative record . . . As Cariten explained
> . . . Smith never administratively appealed Cariten's benefits
> determination . . . . Nonetheless . . . upon Smith's filing of his
> Complaint, Cariten *sua sponte* reexamined [Plaintiff's] claims and
> adjusted the [ER] claim, which redounded to [Plaintiff's] benefit.

[*Id.* at 4-5].

Although Plaintiff did file a complaint with the TDCI, Cariten's July 20, 2006 letter to

Plaintiff also informed him that he had the right to appeal its benefits decisions to an IRO which was

not in any way connected to Cariten, but whose decisions and instructions were binding on Cariten

(A.R. 107). The record contains no evidence Plaintiff ever sought to appeal Cariten's decision to

the IRO. Plaintiff has not asserted he ever did so. The record does contain a claims summary, dated

May 1, 2008, which indicates that Cariten paid the entire $7945.08 billed by the Cleveland Clinic

for Plaintiff's treatment at from October 13, 2005 to October 15, 2005; namely, his treatment in the

ER and subsequently following the radiofrequency ablation for atrial fibrillation/pulmonary vein

isolation procedure on October 11, 2005.

Cariten is correct in its assertion that as this aspect of Plaintiff's claims against Cariten has now been paid in full, Plaintiff has no further claims against Cariten under ERISA for his treatment at the Cleveland Clinic from October 13, 2005 to October 15, 2005. Plaintiff did not pursue an appeal of Cariten's benefits determination to the IRO and Cariten has now corrected any error in its initial benefits determination, at least as to this aspect of Plaintiff's claims.

### c.      Inconsistencies

Plaintiff also complains about certain "arbitrary" inconsistencies in the record as to Cariten's liability for Plaintiff's treatment at the Cleveland Clinic asserting Cariten gave inconsistent explanations to the TDCI as to how it calculated the benefit it would pay for Plaintiff's October 13 to 15, 2005 treatment at the Cleveland Clinic, including his ER and inpatient treatment. However, as noted, Cariten has paid these claims in full and Plaintiff has no further ERISA claims against Cariten for this period of treatment.

Plaintiff also claims Cariten was inconsistent regarding its payment calculation for his October 11, 2005 radiofrequency ablation for the atrial fibrillation/pulmonary vein isolation procedure when it originally agreed to pay a total of $400.00 on these charges and then subsequently paid a higher level of charges. As previously noted, in its March 19, 2007 letter to Manning at the TDCI, Cariten indicated that its claims payment for Plaintiff's treatment had been reversed to pay at a higher level, but was based on Cariten's out-of-network fees schedule of $930 per diem for a surgical bed (A.R. 116). As also noted, attached to Cariten's March 19, 2007 letter is its out-of-network fee schedule which shows that Cariten pays $800 to $930 per diem for out-of-network medical surgical treatment (A.R. 118). Thus, Cariten's decision is supported by its out-of-network fee schedule.

Plaintiff also complains that when Cariten responded to Manning's letter it did not provide an in-network fee schedule as requested by Manning, but sent only Cariten's out-of-network fee schedule. However, as discussed above, Cariten's decision to pay for Plaintiff's radiofrequency ablation for atrial fibrillation/pulmonary vein isolation procedure at out-of-network rates because in-network physicians were available is not arbitrary and capricious. Thus, the failure of Cariten to provide an in-network fee schedule to Manning at the TDCI is not a ground for finding Cariten's benefits decisions were arbitrary and capricious.

Finally, Plaintiff asserts that Cariten's benefits decision is not supported by "substantial evidence" because it allegedly ignored the medical opinion of Dr. Alison, who had personally examined the Plaintiff, and concluded Plaintiff should be treated at the Cleveland Clinic, the only medical center with sufficient experience to perform the necessary procedure. As is discussed in detail above, Cariten, consistent with the Plan documents, identified in-network physicians who could perform the radiofrequency ablation for atrial fibrillation/pulmonary vein isolation procedure and it informed Plaintiff of the in-network physicians who could perform the procedure and that he had the option of having the procedure performed at the Cleveland Clinic as Dr. Alison had recommended, but in so doing the procedure would be reimbursed at in-network rather than out-of-network rates. Plaintiff opted to follow the recommendation of his physician to have the treatment performed at the Cleveland Clinic because his treating physician concluded he would achieve better results there than with an in-network physician. While the Court sympathizes with Plaintiff's obvious dilemma, Plaintiff made his decision to seek treatment at the Cleveland Clinic and Cariten's decision to reimburse the Cleveland Clinic at out-of-network rates was not arbitrary

-26-

and capricious because Cariten was obligated to and did follow the Plan documents in deciding how it would reimburse the Cleveland Clinic for the atrial fibrillation/pulmonary vein isolation procedure.

Having thoroughly reviewed the administrative record in light of the arguments of the parties, I **CONCLUDE** Plaintiff has not shown Cariten was arbitrary and capricious in the way it paid his claims for the treatment he received at the Cleveland Clinic.

### 3. Equitable Estoppel

In his response to Cariten's motion to dismiss, Plaintiff asserts, in the alternative, that Cariten "materially misrepresented Plaintiff's financial liability for his Cleveland Clinic treatments, and thus, . . . Cariten is now equitably estopped from denying its liability to pay all charges incurred, minus Plaintiff's Policy $4,000 out-of-pocket maximum." [Doc. 13 at 15]. Plaintiff asserts he was advised that the maximum out-of-pocket expense he would incur, even for out-of-network treatment under the Plan was $4,000.00. Plaintiff asserts that this misrepresentation is material because if he had known his individual financial liability for the procedure could have exceeded his $4,000.00 annual out-of-pocket maximum, he could have obtained alternate insurance coverage prior to his admission [Doc. 13 at 17]. Plaintiff admits "[t]he administrative record is devoid of pre-October 11, 2005 communications between Plaintiff and [Cariten] regarding the out -of-pocket issue." [*Id.*]. Plaintiff asserts, however, there was a material misrepresentation concerning his liability when he contacted Cariten on January 12, 2006, following his treatment at the Cleveland Clinic [*id.*]. Plaintiff asserts the alleged misrepresentation that occurred on January 12, 2006 was material because:

> once [Cariten's] representative learned that Plaintiff was "upset"
> that he might be liable for a greater percentage of the medical bills
> that he believed, the representative had an affirmative duty to

-27-

> communicate to Plaintiff unequivocally that . . . Plaintiff was to
> pay all charges billed by the clinic, but not covered as an allowable
> expense, as it was clear that plaintiff did not believe this to be true
> under the Policy.

*Id.* at 18. Plaintiff also asserts he detrimentally relied on Cariten's assertions he would be solely responsible for a maximum out-of-pocket cost for procedure and that "absent such detrimental reliance, Plaintiff could have located and obtained alternate insurance coverage so as to avoid incurring substantial personal financial liability for such medical treatment." [*Id.* at 20].

Cariten responds that Plaintiff cannot establish all of the required elements of equitable estoppel because: (1) the Plan is not ambiguous and (2) Plaintiff cannot establish reasonable reliance on Cariten's communication on January 12, 2006, which occurred well after his procedure on October 11, 2005 and after his follow-up visit for his final treatment at the Cleveland Clinic [Doc. 14] .

### a. Standard

Equitable estoppel applies only to ERISA plans whose provisions are ambiguous. *Sprague v. General Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998). The elements of an equitable estoppel claim are:

> (1) there must be conduct or language amounting to a
> representation of material fact; (2) the party to be estopped must
> be aware of the true facts; (3) the party to be estopped must intend
> that the representation be acted on, or the party asserting the
> estoppel must reasonably believe that the party to be estopped so
> intends; (4) the party asserting the estoppel must be unaware of the
> true facts; and (5) the party asserting the estoppel must reasonably
> or justifiably rely on the representation to his detriment.

*Id.*

Equitable estoppel "cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." *Id.* at 404. There are two reasons why estoppel cannot be invoked or applied to unambiguous plan documents:

> First, as we have seen, estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party. Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

*Id.*

Equitable estoppel actions generally "occur when a plan fiduciary misrepresents the actual meaning of plan terms in a situation where the plan itself is ambiguous." *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 429 (6th Cir. 2006). It is the plaintiff who bears the burden of establishing the elements of a claim of equitable estoppel. *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 431 (6th Cir. 2007). All five of the elements of equitable estoppel must be present before a district court can order estoppel with regard to an ERISA plan. *Trustees of Michigan Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2007).

### b.      The Plan Is Not Ambiguous

Plaintiff asserts the Plan is ambiguous because the Plan documents do not define the term "balance billing" [Doc. 13 at 21]. A plan's language is ambiguous when it is subject to two reasonable interpretations. *Schachner v. BlueCross BlueShield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996). I find the Plan at issue is not patently ambiguous. The Schedule of Insurance of the Plan states, in relevant part:

-29-

When a Nonparticipating Provider provides a confinement, supply service, test, procedure, examination treatment, or any other medical or heath care item or service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, benefits will be determined in accordance with the column on the Summary of Benefits entitled "Out-of-Network."

If a Member obtains from a Nonparticipating Provider a confinement, supply, service, test, procedure, examination, treatment, or any other medical or health care item or service that is a Covered Expense or a Covered Prescription Drug Expense, if applicable, the Member may be responsible for the difference between the Nonparticipating Provider's charges and the Maximum Allowable Charge if the Nonparticipating Provider's charges are more than the Maximum Allowable Charge for such item or service.
. . .
After a Member satisfies the Out-of Pocket Maximum during a Calendar Year, the Percentage Payable changes to 100% for the remainder of the Calendar Year.

(A.R. 25).

The Certificate of Insurance for the Plan states:

**OUT-OF-POCKET MAXIMUM**: There are individual and family Out-of-Pocket Maximums for benefits provided by Participating Providers and Nonparticipating Providers. Any Expense Incurred by a Member for Covered Expenses that are applied to any applicable Out-of Pocket Maximum shall be applied equally toward both the in-network and out-of-network Out of Pocket Maximums. The individual and family in-network and out-of-network Out-of-Pocket Maximums are shown in the Schedule of Insurance and the Summary of Benefits.

(A.R. 44).

With regard to the out-of-pocket maximum, the Summary Plan Description states:

**MAXIMUM ALLOWABLE CHARGE:** Means the fee schedule charge for a Covered Expense or Covered Prescription Drug Expense, if applicable, set forth in Cariten's then currently

-30-

approved fee schedules for Participating and Nonparticipating Providers.

. . .

**OUT-OF-POCKET MAXIMUM:** Means the maximum amount of percentage Copayments and Excess Charges payable by a Member or Insured Members of a Family in any Calendar Year; provided that Deductibles, fixed Copayments and Expenses Incurred resulting from failure to obtain Precertification, prescription drugs and Excluded Services do not apply toward the Out-of-Pocket Maximum.

(A.R. 68-69).

The Summary Plan Description provides:

**EXCESS CHARGES:** Means charges by a provider of Covered Expenses or Covered Prescription Drug Expenses, if applicable, that exceed the Maximum Allowable Charge. The Member is responsible for payment of Excess Charges, subject to the Out-of Pocket Maximum

(A.R. 65).

While the Summary of Benefits, which is set forth in detail above, also provides the out-of-network out-of-pocket maximum for an individual is $4,000.00, it clearly states in a footnote that a "Member may be subject to balance billing from Nonparticipating Providers for any out-of-network benefits." (A.R. 8). As noted, Plaintiff asserts the term "balance billing" in the Summary of Benefits is ambiguous because the Plan does not define the term [Doc. 13 at 21].

In addition to the language in the Summary of Benefits, the Plan's Schedule of Insurance clearly states that a "Member" covered under the Plan who obtains services from an out-of-network provider, "may be responsible for the difference between the Nonparticipating Provider's charges and the Maximum Allowable Charge if the Nonparticipating Provider's charges are more than the Maximum Allowable Charge for such item or service," (A.R. 25). The provisions in the Summary

-31-

of Benefits and Schedule of Insurance are not ambiguous because they both state a member who is covered under the Plan may be billed by a non-participating provider for the unpaid balance for services provided. These provisions are only subject to one reasonable interpretation. Moreover, no statement in the Plan documents, including the Summary of Benefits or the Summary Plan Description, expressly states, or can reasonably be interpreted as providing, that the maximum out-of-pocket amount an individual would pay for services from an out-of-network provider (a Nonparticipating Provider under the Plan) is limited to $4,000.00.

Therefore, I **CONCLUDE** the Plan is not patently ambiguous. Although I am sympathetic to Plaintiff's position, equitable estoppel applies only to ambiguous ERISA plans. *Sprague*, 133 F.3d at 404. Because I have concluded the Plan is unambiguous, the doctrine of equitable estoppel does not apply to this case.

### c. Reasonable Reliance

Plaintiff also asserts the oral representations made in certain telephone conversations between Cariten and himself should be interpreted as a modification of the Plan and that Cariten should be estopped from denying it made such representations/modification [Doc. 13 at 21]. In this regard, Plaintiff states:

> on January 12, 2006, after his follow-up treatment at Cleveland Clinic, Plaintiff called [Cariten] "upset that he may be faced with very large bills[.] (AR 96). The phone representative misleadingly "advised that his [out-of-network, out-of-pocket liability] is 4000.00," also advising that Plaintiff "speak with cleveland clinic regarding billing." (AR 96.) [Cariten] knew of Plaintiff's concerns and understanding of his insurance coverage, and yet [Cariten] points to no page in the administrative record demonstrating that [Cariten] clearly and concisely explained Plaintiff's personal financial liability regarding the Cleveland Clinic care *prior* to admission for any of the three treatments on October 11 and 13,

2005, or January 18, 2006. Clearly, Plaintiff relied to his detriment upon the negligent misrepresentations and omissions of [Cariten].

[Doc. 13 at 21].

Cariten responds that Plaintiff cannot establish actual, reasonable or justified reliance because Plaintiff:

> refers to his communication with Cariten "on January 12, 2006, following his follow-up and final appointment at Cleveland Clinic, expressing outrage . . . ." [Ct. Doc. No. 13, p. 20]. As Smith concedes, the alleged misrepresentation came after a follow-up visit for his final treatment at the Cleveland Clinic. [Plaintiff] claims that "[a]bsent such detrimental reliance, Plaintiff could have located and obtained alternate insurance coverage . . . ." [Plaintiff] does not, and cannot, identify any insurance company that would agree to write a policy covering treatment that had already been provided. [Plaintiff] did not rely on anything – he had been treated at the Cleveland Clinic before the communication allegedly provoking such reliance."

[Doc. 14 at 12].

A CSF which states that it originated on January 12, 2006 and closed February 11, 2006, states in pertinent:

> mbr (member) is upset that he may be faced with very large bills and I advised that his ONN OOP (out-of-network out-of-pocket) is 4000.00.
>
> mbr (member) concerned that he is still receiving large bills and I advised him to speak with cleveland clinic regarding billing and verification of benefits prior to services being performed.
>
> mbr states that he is going for a check up next week and will speak with the hosp regarding billing . . . .

(A.R. 96).

Contrary to Cariten's position, there is some evidence in the record that Plaintiff had a conversation with someone at Cariten about the amount he would have to pay for his treatment at the Cleveland Clinic prior to his treatment. In his amended complaint Plaintiff asserts he "discussed this with a coverage representative of [Cariten] prior to leaving for his surgery, and he was assured that his maximum payment for his surgical treatment was $4,000.00" [Doc. 24 at 2, ¶ 4]. The administrative record also shows that in the letter Plaintiff wrote to the TDCI on October 16, 2006, he stated, in relevant part, that:

> I am writing concerning the refusal of Cariten Healthcare to pay my medical bills. They refuse to pay, but do not tell me why. They just tell me that their Physician Advisor has reviewed my situation and determined that they are not libel [sic] for the expenses. This is in contrast to what I was told by a member of the Claims Supervisor Staff at Caratin [sic]. **Before I went to Cleveland I called Cariten and was told that "$4,000.00 would be the most I would have to pay and all else would be paid by Caritene [sic] or deducted by The Cleveland Clinic"**. Apparently the Cleveland Clinic was told the same thing because they called me and requested that the $4,000.00 be paid before the surgery. They agreed to come to the hotel and pick up the check upon my arrival the day before the scheduled surgery. I was to call them upon arrival and I did just that but was told at that time it would not be necessary for them to come get the money.

(A.R. 157) (emphasis added).

Despite such evidence, however, "unambiguous written provisions of a plan must control, and extrinsic evidence may not be introduced to vary the express terms of a plan." *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993). "Courts have recognized that estoppel principles cannot be invoked to change unambiguous plan language." *Rittenhouse v. Professional Micro Systems, Inc.*, No. C-3-98-89, 1999 WL 33117263, * 6 (S.D. Ohio Jul. 21, 1999). The principle that estoppel will not be utilized even when a misrepresentation has been made that "flatly

-34-

contradict[s] ERISA plan language has been applied to both oral and informal written misrepresentations." *Id.* (citing *Miller v. Coastal Corp.*, 978 F.2d 622, 624 (10th Cir. 1992); *Slice v. Sons of Norway*, 34 F.3d 630, 634 (8th Cir. 1994); *Law v. Ernst & Young*, 956 F.2d 364, 367-68 (1st Cir. 1992). Because the Plan is not ambiguous, the terms of the Plan control and the Court should not consider extrinsic evidence of an alleged modification to the Plan's written terms.

Accordingly, I **RECOMMEND** the aspect of Cariten's motions to dismiss which seeks dismissal of Plaintiff's ERISA claims and a judgment on the ERISA administrative record be **GRANTED**.

## IV.    Conclusion

For the reasons set forth above, I **RECOMMEND**:[4]

> (1) the aspect of Cariten's original motion to dismiss which seeks dismissal of Plaintiff's state law claims on the grounds they are completely preempted by ERISA [Doc. 4] be **GRANTED;** and

> (2) the aspect of Cariten's motions which seeks dismissal of Plaintiff's ERISA claims and a judgment on the ERISA administrative record [Doc. 4 & 25] be **GRANTED**.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[4]  Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).